UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MAHESH GOYAL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:13-CV-4751-B |
| | § | |
| GOODMAN NETWORKS INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Goodman Networks Inc.'s ("Goodman") Motion for Summary Judgment (doc. 19), filed November 10, 2014. For the reasons that follow, the Court concludes that Goodman's motion should be, and hereby is, **GRANTED**.

## I.

## BACKGROUND[1]

A.    *Factual Background*

This is a case for unlawful employment discrimination and retaliation under 42 U.S.C. § 1981 ("Section 1981"). Plaintiff Mahesh Goyal, who is Indian, is a former employee of Goodman, where he worked as an Oracle Developer from January 2012, when he was hired, until his termination on September 27, 2013. Doc. 21, Appendix in Support of Defendant's Motion for Summary Judgment ("Def.'s App.") 3, 5 (Goyal Dep. 18, 46–47); doc. 23, Appendix to Plaintiff's Response to Defendant's Motion for Summary Judgment ("Pl.'s App.") 1 (Goyal Dec. ¶ 3). In this capacity,

---

[1] The Court takes its factual account from the uncontested facts contained in the summary judgment record. Any contested fact is identified as the allegation of a particular party.

Plaintiff managed and maintained Goodman's Oracle software applications, as well as developed and designed new aspects of the Oracle applications. Def.'s App. 5–6 (Goyal Dep. 47–50); Pl.'s App. 1 (Goyal Dec. ¶¶ 3, 5). Plaintiff's immediate supervisor at all times relevant to his complaint was Sherad Karkera. Def.'s App. 3 (Goyal Dep. 49–50); Pl.'s App. 2 (Goyal Dec. ¶ 5).

The events giving rise to Plaintiff's claims in this action began in August 2013, when a customer asked Plaintiff to provide notification if the Oracle System would be down. Def.'s App. 7 (Goyal Dep. 54). In response to the customer's request, Plaintiff created a ticket, which he forwarded to Goodman's Help Desk, where it was assigned to Gerald ("Ged") Usher, then the Help Desk Manager.[2] *Id.* Approximately a week later, Plaintiff received an email from the customer inquiring about the status of the ticket. *Id.* at 8 (Goyal Dep. 59). In an effort to resolve the customer's concern, Plaintiff directed Lillian Benton, another Help Desk employee, to assign the ticket to him. *Id.* Plaintiff then instructed Michael Holton, a Help Desk employee, to add the customer to a mailing list of individuals that Goodman notifies when the Oracle system is going to be down. *Id.*

Because Plaintiff's actions circumvented the Help Desk hierarchy, Usher approached Plaintiff to ask why Plaintiff requested that a Help Desk ticket be assigned to him and closed the ticket without seeking approval. *Id.* (Goyal Dep. 59–60); Pl.'s App. 2 (Goyal Dec. ¶ 6). According to Plaintiff, Usher was "very angry, very upset, and very demeaning" during this initial discussion, but did not use profanity. *Id.* Plaintiff never reported this incident to anyone at Goodman. *Id.*

About a month later, on September 24, 2013, Usher again confronted Plaintiff at his cubicle

---

[2] As the Help Desk Manager, Usher oversaw a team of five employees who comprised the Help Desk. Def.'s App. 6 (Goyal Dep. 50), 38 (Garner Dec. ¶ 8). He did not, however, have any supervisory authority over Plaintiff, who was part of Goodman's Oracle developer unit. Def.'s App. 6, 10 (Goyal Dep. 53, 69).

to ask Plaintiff why he had unilaterally closed the ticket. Def.'s App. 9 (Goyal Dep. 62–63); Pl.'s App. 2 (Goyal Dec. ¶ 7). According to Plaintiff, Usher was "extremely angry" and his tone was "very demeaning, very disrespectful, very disparaging." Def.'s App. 9 (62–63); Pl.'s App. 2–3 (Goyal Dec. ¶ 7). In response to Usher's inquiry, Plaintiff told Usher that he closed the ticket per company policies and procedures. *Id.* After several more rounds of similar calls and responses, Plaintiff asked Usher to leave his cubicle. *Id.* Plaintiff does not recall Usher making any race-related comments during the encounter or using profanity. Def.'s App. 10, 14 (Goyal Dep. 67, 82–83).

Shortly thereafter, Karkera met with Plaintiff, Usher, Cook, and Surendra Bollinelli, another Oracle developer, to discuss the incident. Pl.'s App. 3 (Goyal Dec. ¶ 8). After asking both Plaintiff and Usher to calm down and instructing Usher that he could not treat Plaintiff "like your average everyday Help Desk," Karkera directed Plaintiff and Usher to meet one-on-one the next day to sort out their differences. Def.'s App. 10–11 (Goyal Dep. 69, 71). Plaintiff did not report any race-related incidents at this meeting. *See generally id.*

The next day, September 25, Plaintiff and Usher met as instructed to work on improving their relationship. *Id.* at 12, 15 (Goyal Dep. 76, 86–88). Things got off to a rocky start, however, when Usher questioned Plaintiff's refusal to say hello to him earlier that morning, to which Plaintiff responded that he had wanted to call Usher a "jackass" instead. *Id.* From there, Plaintiff proceeded to escalate the situation further by using profanity and making a number of inflammatory remarks, including telling Usher that he had a "racist attitude," indicating to Usher, "I've hired and fired people like you," and explaining to Usher that "even though your bosses' boss is Indian and his boss is also Indian, you were treating me like a H1B worker. I'm not H1B. I'm not one of those poor people who are sitting over there . . . ." *Id.* at 15–16 (Goyal Dep. 86–87, 89, 91–92), 39 (Garner Dec.

¶ 11).

Following their one-on-one meeting, Usher reported the incident to Patricia Garner, Goodman's Senior Employee Relations Manager. *Id.* at 38 (Garner Dec. ¶ 10). According to Ms. Garner, Usher was visibly shaken, red in the face, and on the verge of tears when he reported Plaintiff's conduct. *Id.* at 38 (Garner Dec. ¶ 10). As a result, Garner met with Plaintiff that same day to discuss his conduct. *Id.* at 18 (Goyal Dep. 98–99), 38 (Garner Dec. ¶ 10). During the meeting, Plaintiff admitted to using profanity and making unprofessional remarks. *Id.* at 38 (Garner Dec. ¶ 10). He also advised Garner that he felt that Usher was racist and mistreating him for that reason. *Id.*; Pl.'s App. 3 (Goyal Dec. ¶ 9). Except for highlighting Usher's demeaning and disrespectful look and tone, however, Plaintiff did not offer any support for his allegation that Usher had a racist attitude. Def.'s App. 17–18 (98–101), 39 (Garner Dec. ¶ 11).

Two days later, on September 27, Garner and Karkera met with Plaintiff to discuss his conduct and issue him a written warning (the "corrective action").[3] *Id.* at 19 (Goyal Dep. 105); 39–40 (Garner Dec. ¶¶ 12–13). The corrective action detailed Plaintiff's unprofessional conduct and the steps Goodman expected him to take to improve his conduct. *Id.* at 20–21 (Goyal Dep. 109–110), 33–34 (Goyal Dep. Ex. 4). During the meeting, Garner attempted to read the corrective action to Plaintiff, but was repeatedly interrupted by Plaintiff in a manner that Garner perceived as being rude and combative. *Id.* at 21 (Goyal Dep. 110), 39 (Garner Dec. ¶ 13). After reading the corrective action to Plaintiff, Garner provided him a copy and requested that he acknowledge receipt and agree to meet Goodman's expectations moving forward. *Id.* at 40 (Garner Dec. ¶ 13). Plaintiff

---

[3] Prior to receiving this written warning, Plaintiff had never been disciplined by Goodman. Pl.'s App. 3 (Goyal Dec. ¶ 10).

refused to sign the corrective action unless the corrective action was revised to address the details of the incident with Usher in greater detail.[4] *Id.* at 23 (118:21–119:11), 40 (Garner Dec. ¶ 13). He then removed a tape recorder, recited a Texas Statute relating to the recording of conversations, and noted the date, time, and those in attendance. *Id.* at 40 (Garner Dec. ¶ 13), 52. The meeting ended when Plaintiff announced that he was not feeling well and was going home. *Id.*; Pl.'s App. 4 (Goyal Dec. ¶ 12).

Following the meeting to discuss the corrective action, Garner, with input from Karkera, recommended that Goodman terminate Plaintiff based on his deplorable conduct during the meeting and her belief that Plaintiff was incapable of improving his behavior. Def.'s App. 41 (Garner Dec. ¶ 15), 51–53. Based on this recommendation, Goodman terminated Plaintiff's employment on September 27, 2013. *Id.* at 41 (Garner Dec. ¶ 15), 51. According to Garner, Goodman fired Plaintiff because "he refused to abide by Goodman's policies or be accountable for his use of profanity and unprofessional outbursts toward a coworker, and he conducted himself in a combative and unprofessional manner during the corrective action meeting intended to address these concerns." *Id.* at 41 (Garner Dec. ¶ 15).

Prior to Plaintiff's termination, Goodman initiated a "360 review" of Usher's performance as the Help Desk Manager in response to complaints from Help Desk personnel pertaining to his management style. *Id.* at 42 (Garner Dec. ¶ 19). As part of the review, Goodman solicited input from each member of the Help Desk. *Id.* In general, the Help Desk employees felt that Usher was too

---

[4] Plaintiff disputes that in refusing to sign the corrective action, he was refusing to make the improvements that Goodman expected. Pl.'s App. 4 (Goyal Dec. ¶ 11). He further alleges that during the meeting, he again asked Garner to investigate Usher's racist behavior. Pl. App. 4 (Goyal Dec. ¶ 11).

authoritarian; however, no one reported that Usher had ever made any comments related to race or otherwise engaged in discriminatory conduct. *Id.*; *see also* Pl.'s App. 9–11. In light of employee comments, Goodman counseled Usher over the next several months in an attempt to improve his management skills. Def.'s App. 42 (Garner Dec. ¶ 19). Despite its efforts, however, Goodman terminated Usher because he was unable to improve his managerial skills. *Id.*; *see also* Pl.'s App. 13.

B.      *Procedural Background*

Plaintiff filed suit against Goodman in this Court on December 4, 2013, asserting claims for unlawful employment discrimination and retaliation under 42 U.S.C. § 1981 ("Section 1981"). Goodman filed its instant motion for summary judgment on November 10, 2014. Doc. 19, Motion for Summary Judgment; doc. 20, Defendant's Brief in Support ("Def.'s Br."). Plaintiff filed his response to Defendant's motion on December 1, 2014, to which Defendant replied on December 15, 2014. Doc. 22, Plaintiff's Response ("Resp."); doc. 24, Defendant's Reply ("Reply"). Accordingly, Defendant's motion is now ripe for review.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs*, 919 F.2d 301, 303 (5th Cir. 1990). However, if the non-movant ultimately bears the burden of proof at trial, the summary judgment movant may

satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once the summary judgment movant has met this burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). In determining whether a genuine issue exists for trial, the court will view all of the evidence in the light most favorable to the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). But the non-movant must produce more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1076.

## III.

## ANALYSIS

A.    *Plaintiff's Section 1981 Race Discrimination Claim*

The first target of Goodman's summary judgment motion is Plaintiff's Section 1981 race discrimination claim. Because Plaintiff has not presented any direct evidence of racial animus on the part of Goodman, the Court examines Plaintiff's Section 1981 claims under the familiar *McDonald Douglas* burden-shifting framework. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 n.7 (5th Cir. 2004) (citing cases). Under this framework, an employee must first make out a *prima facie* case for race discrimination by producing evidence to show "(1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical

circumstances." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Upon the employee's making of a such a showing, the burden of production shifts to the employer who must provide a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer can articulate a legitimate, non-discriminatory explanation, the burden returns to the employee to demonstrate that the employer's explanation is not credible and merely a pretext for race-based discrimination. *Id.*

Goodman argues that Plaintiff's race-based discrimination claim under Section 1981 fails for two reasons. First, Goodman contends that Plaintiff cannot establish a *prima facie* case for discrimination, because he cannot show that he suffered an adverse employment action or received less favorable treatment than a similarly situated employee, under nearly identical circumstances. Def.'s Br. 18; Reply 9. Second, it insists that Plaintiff has not presented sufficient evidence to raise a triable issue of fact as to pretext. Def.'s Br. 19; Reply 9. The Court addresses each of these purported grounds for summary judgment and Plaintiff's responses, in turn, below.

1.    Plaintiff's *Prima Facie* Case

As stated above, Goodman maintains that Plaintiff's *prima facie* case fails because he cannot show that he suffered an adverse employment action. Def.'s Br. 8. Goodman bases its argument on Plaintiff's inability in his deposition to identify anyone at Goodman who discriminated against him on the basis of his race, other than Usher, who had no input into Plaintiff's discipline or termination. *Id.* at 18–19.

Goodman's argument, however, conflates Plaintiff's ultimate burden of persuasion with the showing required to state a *prima facie*. Although to ultimately prevail on a race discrimination claim, the plaintiff "must prove that [race] 'actually played a role in' and 'had a determinative influence on'

the employer's decision-making process[,]" *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir.1997) (footnote omitted), to satisfy the adverse employment action element of the *prima face* case, the plaintiff need only show that his employer took an action that negatively affected his job duties, compensation, or benefits, "such as hiring, granting leave, discharging, promoting, and compensating." *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003) (internal quotations and citations omitted). Here, the undisputed evidence shows that Goodman terminated Plaintiff following their meeting to discuss Plaintiff's corrective action. Accordingly, there is no question that Plaintiff suffered an adverse employment action.[5]

The Court's inquiry does not stop here, however, because in order to establish a *prima facie* case of discrimination, Plaintiff must still demonstrate that Usher was comparably situated to him, yet received more favorable treatment from Goodman "under nearly identical circumstances."[6] *Lee*, 574 F.3d at 260. Under Fifth Circuit law, "[t]he employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, . . . have essentially comparable violation histories[,]" and critically, engaged in nearly identical conduct. *Id.* But "[i]f the difference between the plaintiff's conduct and

---

[5] In any case, Plaintiff has clarified that his discrimination claim rests not on Usher's racist behavior towards him, but rather on Goodman's disparate treatment of Plaintiff and Usher's respective disciplinary infractions. Resp. 14–18.

[6] As with other forms of intentional discrimination, providing evidence of "similarly situated employees" is not the only method by which Plaintiff may discharge his burden of establishing a *prima facie* case of intentional discrimination. Plaintiff may also establish the forth element of his *prima facie* case by showing that he "was otherwise discharged because of his race." *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004). However, because Plaintiff has not relied on such a theory in his complaint or briefing, the Court focuses solely on his evidence of disparate treatment.

that of those alleged to be similarly situated accounts for the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* (internal quotations and citations omitted).

To satisfy this element, Plaintiff points to the fact that similar to Usher, he "had not been reprimanded, written up or otherwise disciplined prior to September 27, 2013." Resp. 15. But whereas he was immediately issued a corrective action and subsequently terminated after a single incident of misconduct, Usher was subjected to a "360 review" and counseled over months of continued misbehavior before finally being discharged. *Id.* at 14–18.

As Goodman correctly observes, however, Plaintiff and Usher did not hold the same job or responsibilities. Plaintiff was an Oracle Developer IV, a non-managerial position responsible for maintaining Goodman's Oracle software applications. Def.'s App. 5–6 (Goyal Dep. 47–50), 37 (Garner Dec. ¶ 7); Pl.'s App. 1 (Goyal Dec. ¶ 3). Usher, by contrast, was the Help Desk Manager and responsible for supervising a staff of employees. Def.'s App. 38, 42 (Garner Dec. ¶¶ 8, 19); Pl.'s App. 2 (Goyal Dec. ¶ 6). Moreover, Plaintiff's misconduct was not "nearly identical" to Usher's. Plaintiff has presented no evidence that Usher used profane and combative language with a coworker or conducted himself unprofessionally in any meeting with a supervisor or Employee Relations. Rather, the undisputed evidence shows that Goodman initiated a "360 review" to address complaints from Usher's subordinates about his managerial style and performance as a supervisor, none of which involved Usher's use of profanity, expletives, or the like. Def.'s App. 42; Pl.'s App. 9–10. As such, the Court concludes that Plaintiff and Usher were not similarly situated and, therefore, Plaintiff may not use Goodman's allegedly favorable treatment of Usher as a basis for establishing a *prima facie* case

of employment discrimination under Section 1981.[7]

## 2.     Pretext for Discrimination

Because Plaintiff's evidence is insufficient to establish a *prima facie* case of discrimination under Section 1981, the Court need not decide whether he has presented sufficient evidence to refute Goodman's purportedly legitimate, non-discriminatory reason for terminating him.

## B.     *The Section 1981 Retaliation Claim*

Goodman also moves for summary judgment on Plaintiff's Section 1981 retaliation claim. Goodman argues that it is entitled to summary judgment on Plaintiff's retaliation claim for three reasons: "(1) he [Plaintiff] admits he never complained to anyone that he was being treated differently because of his race, (2) there is no causal link between any protected conduct and his termination, and (3) he cannot rebut Goodman's legitimate, non-retaliatory reason for his discharge—unprofessional and belligerent conduct[—]under the applicable "but for standard."" Def.'s Br. 21. Plaintiff disputes these contentions and argues the summary judgment evidence raises a genuine issue of material as to whether Goodman fired Plaintiff due to his opposition to Usher's racist behavior. Resp. 10–14.

When it comes to proving claims of retaliation under Section 1981, the initial burden is on the plaintiff to establish a *prima facie* case by showing that (1) he engaged in an activity protected by Section 1981; (2) he was subject to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Davis v. Dall. Area Rapid Transit,*

---

[7] Even if Plaintiff could show that Usher was similarly situated to him, it is by no means clear from the summary judgment evidence that he was treated more favorably than Plaintiff, because he, like Plaintiff, was ultimately terminated after he repeatedly failed to improve his managerial performance and his treatment of subordinates. Def.'s App. 42 (Garner Dec. ¶ 19); Pl.'s App. 9–13.

383 F.3d 309, 319 (5th Cir. 2003); *see also Foley v. Univ. of Hous. Sys.*, 324 F.3d 310, 316 (5th Cir.

2003) (the elements for establishing a *prima facie* case of retaliation under Section 1981 are identical

to those that must be established under Title VII). Once the plaintiff has made out a *prima facie* case,

the burden shifts to the employer to put forward evidence of a legitimate, non-retaliatory purpose

for its actions. *Davis*, 383 F.3d at 319. If the employer meets this burden, the burden once again shifts

to plaintiff to prove that the employer's proffered rationale was merely a pretext for retaliation. *Id.*

### 1.   Plaintiff's *Prima Facie* Case

As stated above, Goodman contends that Plaintiff's *prima facie* case of retaliation fails at the

outset because he cannot show that he engaged in lawfully protected activity. Def.'s Br. 22.

According to Goodman, Plaintiff admits that he never complained to anyone at Goodman that he

was being discriminated against, harassed, or otherwise treated differently because of his race and

Plaintiff's "racist attitude" remark to Usher is too vague to constitute protected activity. *Id.* at 22–23.

But even if Plaintiff is able to establish that his "racist attitude" comment to Usher constitutes

protected activity, Goodman argues that his *prima facie* case fails because he can only speculate that

Goodman fired him due to his "racist" comment and such speculation is not enough to establish a

causal link between the two. *Id.* at 24. Furthermore, it contends that Plaintiff's remarks regarding

Usher's "racist" behavior could not possibility have been the cause of Goodman's decision to

terminate Plaintiff because both Garner and Karkera were aware of Plaintiff's "racist" comment to

Usher when they prepared his corrective action yet decided not to terminate him. *Id.* at 25.

Plaintiff disputes both of these contentions. Instead, relying on his sworn declaration, Plaintiff

maintains that he engaged in protected conduct on two occasions: first, when he advised Garner

during their September 25, 2014 meeting of his belief that Usher's actions towards him—i.e.,

confronting him in his cubicle about the closed help ticket and speaking to him in a demeaning and unprofessional manner—were racist or that Usher had a "racist attitude"; and second, when he reiterated this concern to Garner and Karkera during their September 27, 2014 meeting to discuss Plaintiff's corrective action and asked Garner to investigate.[8] Resp. 10–12. Furthermore, Plaintiff argues that the close temporal relationship between his complaints to Garner and Karkera and his termination—he was fired later the same day—is sufficient to establish a causal connection between the two. Resp. 12–13.

Having reviewed the Parties' respective arguments and authority in light of the summary judgment record, the Court concludes that Plaintiff's complaints to Garner and Karkera regarding Usher's racist actions did not constitute protected activity under Section 1981 and, therefore, his *prima facie* case of retaliation necessarily fails. Under both Title VII and Section 1981, an employee has engaged in protected activity if she has "opposed any practice made an unlawful employment practice under [Title VII]." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (quoting 42 U.S.C. § 2000e–3(a)). To satisfy this requirement, a plaintiff need only show that he had a "reasonable belief that the employer was engaged in unlawful employment practices" and that he communicated this belief to his employer. *See id.* (internal quotations and citations omitted). Isolated incidents of racist comments or behavior, however, are not sufficient to support a reasonable belief of unlawful employment discrimination. *See Turner*, 476 F.3d at 348 (employee could not have reasonably believed that a supervisor's isolated comments, even if racially insensitive, constituted

---

[8] Goodman disputes this characterization of the two meetings and observes that it conflicts with the testimony that Plaintiff gave at his deposition. Reply 4. But even accepting the statements made by Plaintiff in his declaration as true, Goodman argues that Plaintiff's remarks to Garner and Karkera were too general to constitute protected activity under Section 1981. Reply 3–5.

unlawful discrimination); *Satterwhite v. City of Hous.*, No. 14-20240, 2015 WL 877655, at *3 (5th Cir. Mar. 3, 2015) (plaintiff could not have reasonably believed that single "Heil Hitler" comment was actionable under Title VII).

In this case, the only alleged incident of unlawful employment discrimination that Plaintiff reported to Goodman was Usher's act of speaking to Plaintiff, on a single occasion, in a tone and manner that Plaintiff perceived as demeaning, disrespectful, and unprofessional.[9] Moreover, unlike in *Turner* and *Satterwhite*, there is no evidence that Usher ever made any racially insensitive comments to Plaintiff. As such, Plaintiff could not reasonably have believed that Usher was engaged in unlawful employment discrimination and, therefore, did not engage in a protected activity when he reported this incident to Garner and Karkera.

Because Plaintiff did not engage in any protected activity, Plaintiff cannot establish a *prima facie* case of retaliation and, therefore, the Court need not decide whether there was a causal link between Plaintiff's reporting of Usher's "racist attitude" to Goodman and his termination.

2.    Pretext for Retaliation

Even assuming Plaintiff could establish a *prima facie* case of retaliation, Goodman would still

---

[9] As evidence of the reasonableness of his belief regarding Usher's "racist attitude," Plaintiff also points to the fact that prior to the cubicle incident, he saw Usher treat other minorities in a demeaning manner while treating Caucasion employees in a professional and cordial manner. Resp. 3; Pl.'s App. 2 (Goyal Dec. ¶ 6). He further notes that at the time he formed his belief, he was aware that Usher had fired the only African-American help desk employee. *Id.* However, because there is no evidence that Plaintiff ever reported these observations to Garner, Karkera, or anyone else at Goodman, these observation are irrelevant to whether Plaintiff engaged in protected conduct. *See Harris–Childs v. Medco Health Solutions, Inc.*, 169 Fed. Appx. 913, 916 (5th Cir. 2006) (plaintiff's complaint of unfair treatment did not put employer on notice that her complaint was based on racial or sexual discrimination and thus did not constitute protected activity); *see also Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (observing that "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII").

-14-

be entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff cannot prove that Goodman's stated reason for his discharge was a pretext for retaliation. To meet the burden of rebutting Goodman's legitimate, non-retaliatory reason for terminating his employment, plaintiff must produce evidence that would permit a reasonable trier of fact to conclude that the adverse action would not have occurred "but for" his protected conduct." *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 806 (5th Cir. 2007) (citing *Septimus v. Univ. of Hous.*, 399 F.3d 601, 608 (5th Cir. 2005)).

As best the Court can tell, Plaintiff maintains that the close temporal relationship between his complaint to Garner and Karkera and his termination—he was fired later the same day—is sufficient to raise a triable issue of fact as to whether his termination was because of his protected activity. Resp. 12–13. Plaintiff also appears to argue that he need not establish pretext, because Goodman has failed to produce evidence to support its stated non-retaliatory reason for firing him. *Id.* at 13–14. According to Plaintiff, Goodman's stated reason—Plaintiff's belligerent and unprofessional behavior—is inadequate, because it is merely a reflection of Garner's subjective belief and, therefore, cannot be rebutted.[10] *Id.* at 14. The Court disagrees with Plaintiff on both accounts.

As an initial matter, the Court rejects Plaintiff's contention that Goodman has not met its burden of articulating a legitimate, non-retaliatory reason for its decision to fire Plaintiff. As Plaintiff correctly observes, to satisfy its burden of production to overcome Plaintiff's *prima facie* case, an employer must articulate a nondiscriminatory reason with "sufficient clarity" to allow the plaintiff "a full and fair opportunity to demonstrate pretext." *Tex. Dep't of Comm. Affairs v. Burdine,* 450 U.S.

---

[10] Plaintiff also observes that Garner could have formed this conclusion about Plaintiff due to her own racial biases.

248, 255–56 (1981). Contrary to Plaintiff's assertion, however, "[t]his does not mean that an employer may not rely on subjective reasons for its personnel decisions. It does mean, though, that to rebut an employee's *prima facie* case, a defendant employer must articulate in some detail a more specific reason than its own vague and conclusional feeling about the employee." *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004).

Here, Garner explained that the decision to terminate Plaintiff's employment was reached jointly by herself and Karkera, based on Plaintiff's belligerent and unprofessional actions over the course of the four days following his initial incident with Usher. Def.'s App. 41 (Garner Dec. ¶ 15), 51–52. These actions included using profane and combative language with a coworker, repeatedly interrupting Garner while she was attempting to explain the corrective action to Plaintiff and generally acting in an unprofessional manner during their meeting, and refusing to acknowledge the corrective action and agree to act professionally in the workplace. *Id.* Because this explanation is more than sufficiently particular to give Plaintiff "a full and fair opportunity to demonstrate pretext," the Court concludes that Goodman has met its burden of articulating a non-retaliatory reason for discharging Plaintiff. *See Burdine*, 450 U.S. at 255–56.

Moreover, the Court concludes that Plaintiff has not raised a triable of issue of fact as to whether Goodman's rationale was a pretext for retaliation. As Goodman correctly observes, the Fifth Circuit has "reject[ed] the notion that temporal proximity standing alone can be sufficient proof of but for causation" and Plaintiff has not come forward with any other evidence to indicate that Goodman's reason for firing him was pretextual. *Strong*, 482 F.3d at 806. Accordingly, Goodman is entitled to summary judgment on Plaintiff's retaliation claim.

**IV.**

CONCLUSION

For the foregoing reasons, the Court concludes that Goodman is entitled to summary judgment on Plaintiff's claims for unlawful employment discrimination and retaliation under Section 1981. The Court, therefore, **GRANTS** Goodman's Motion for Summary Judgment (doc. 19) and **ORDERS** that Plaintiff take nothing by his suit against Goodman. The Court further **ORDERS** that this suit be **DISMISSED with prejudice**, and that all allowable and reasonable costs be taxed against Plaintiff.


SO ORDERED.

SIGNED: May 13, 2015.


JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

-17-